United States District Court
Southern District of Texas
**ENTERED**
June 10, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CALSEP A/S, | § | |
| CALSEP, INC., | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | No. 4:19-cv-1118 |
| | § | |
| INTELLIGENT PETROLEUM | § | |
| SOFTWARE SOLUTIONS, LLC, | § | |
| ASHISH DABRAL, | § | |
| INSIGHTS RESERVOIR | § | |
| CONSULTING, LLC, and | § | |
| PASHUPATI SAH, | § | |
| | § | |
| *Defendants.* | § | |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON ENTRY OF FINAL JUDGMENT AND PERMANENT INJUNCTION

Plaintiffs Calsep A/S and Calsep, Inc. (collectively "Plaintiffs") move for entry of final judgment on their claims against Defendants Pashupati Sah ("Sah"), Intelligent Petroleum Software Solutions, LLC ("IPSS"), Ashish Dabral ("Dabral"), and Insights Reservoir Consulting, LLC's ("IRC"), (collectively "Defendants"). Pls' Mot. Final Judgt., ECF No. 317.[1] This Court previously granted Plaintiffs' motion for sanctions, including a default judgment against Defendants Dabral, IPSS, and

---

[1] Judge Ellison referred this motion pursuant to 28 U.S.C. § 636 (b)(1)(A). A motion for final judgment seeking injunctive relief is appropriate for a report and recommendation. *Id.*

IRC, as well as recovery of their attorneys' fees and expert costs. Report & Recommendation, ECF No. 293, adopted, Order, ECF No. 304; Order, ECF No. 320. A decree of default was entered against Sah for his failure to appear, plead, or otherwise defend this action. Entry Default, ECF No. 302.

Plaintiffs now move for final judgment. ECF No. 317. As part of their requested relief, Plaintiffs seek actual and exemplary damages. *Id*. at 3. Plaintiffs also seek a permanent injunction barring Defendants from operating in the oil and gas industry and from using Plaintiffs' software to develop a competing product. *Id*. at 6. Because Defendants Dabral, IPSS, and IRC do not oppose entry of an injunction, ECF No. 321 at 10, the Court directed the parties to confer and prepare an agreed permanent injunction. Order, ECF No. 329. However, they were unable to agree. Instead, they submitted a draft with notations indicating the parts to which Defendants objected, which included who was subject to the injunction and the scope of the injunction. Defendants also challenge Plaintiffs' calculation of actual damages and request for exemplary damages. ECF No. 315.[2]

The Court recommends that Plaintiffs' motion should be granted in part.

## I.    BACKGROUND[3]

This is a misappropriation of trade secrets case. This lawsuit arose after

---

[2] Defendants do not challenge Plaintiffs' attorneys' fees.

[3] The facts are taken from the allegations in Plaintiffs' fourth amended complaint which are deemed admitted and taken as true since the Defendants are in default. *Commodity Futures*

Defendant Sah left Plaintiffs' employment. Original Compl., ECF No. 1. In sum, Sah misappropriated Plaintiffs' trade secret information and shared it with the other Defendants to develop a competing product. *Id.*; Fourth Am. Compl., ECF No. 205 at 2-3.

Calsep A/S is the leading provider of PVT simulation services in the oil and gas industry for more than 30 years. ECF No. 205 at 1. Calsep, Inc. sells and markets PVTsim in North and South America through an exclusive licensing agreement with Calsep A/S. *Id.* at 8. Sah was previously employed by Calsep A/S and prior to his last day of employment downloaded and copied hundreds of files—including files where Calsep A/S stored its source code to PVTsim—to at least three personal external storage devices. *Id.* at 15.[4] Defendants then used Calsep's proprietary trade secret and confidential information to start a competing PVT software product they called InPVT. *Id.* Defendants sought to market their competing software product in the United States and across the world. *Id.* at 16. In fact, the evidence shows that Defendants had an agreement with Apache Corp. to develop PVT simulation software, and Apache funded the development. *E.g.,* Hr'g Tr., Apr. 20, 2022, ECF

---

*Trading Comm'n v. Laino Grp. Ltd.*, No. 4:20-CV-03317, 2021 WL 4059385, at *5 (S.D. Tex. June 30, 2021) (citing *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

[4] Calsep Inc.'s President testified that Sah worked for Calsep between 2004 and 2017. He sat on an important committee, and had access to the company's source code. In the weeks between Sah's announced departure and his last day of employment, he downloaded hundreds of files to at least three storage devices that were not company issued, including files that contained Calsep's trade secret source code software. Hr'g Tr., Apr. 20, 2022, ECF No. 355 at 26, 48-49.

No. 355 at 96-97.

Throughout the litigation process, Plaintiffs sought production of Defendants' source code control software[5] to determine if Defendants used Plaintiffs' software to make a competing product in violation of trade secrets laws. Myers Decl., ECF No. 51-1 at 11. Despite Plaintiffs' discovery requests and this Court's orders,[6] Defendants did not produce the source code.[7] After exhausting all other options including obtaining two court orders that Defendants produce the source code, Plaintiffs moved for sanctions, claiming Defendants permanently deleted the files from their system. ECF No. 259 at 17-18. Both Parties' experts agreed that data was

---

[5] Source code control systems "manage and record the intricate details of every change to the source code over time–who made the change, when the change was made, and what the change was." Myers Decl., ECF No. 51-1 at 9. Plaintiffs' expert Monty Myers stated that he intended to compare Plaintiffs' source code control system with Defendants' source code control system to determine what influenced the design of Defendants' source code. *Id.* at 11.

[6] This Court granted Plaintiffs' motion to compel, ECF No. 108, ordering Defendants to produce everything given to their computer forensics expert. Order, ECF No. 150. The Court subsequently granted Plaintiffs' second motion to compel, ECF Nos. 109, 110, ordering Defendant IPSS to produce Sah's hard drives and other requested discovery no later than March 13, 2020. Order, ECF No. 161. The Court also ordered Defendants to produce unredacted copies of the forensic report of the investigation of BPSS' systems given to their expert, after Defendants refused to produce it based on claims of privilege. Order, ECF No. 186. The Court granted Plaintiffs' motion to compel, ordering Sah to respond to discovery and produce the external storage devices used to download Plaintiffs' software. Order, ECF No. 230. On August 17, 2020, the Court granted Plaintiffs' motion to show cause and partially granted their motion for sanctions against Sah. Order, ECF No. 241; Order No. 244. On August 26, 2020, the Court granted Plaintiffs' motion to compel Defendants Dabral and IRC to respond to discovery. Order, ECF No. 250. The Court issued a Report and Recommendation denying without prejudice Plaintiffs' renewed motion for sanctions and default judgment against Sah until resolution of the claims against the other Defendants. R&R, ECF No. 274. Judge Ellison adopted the R&R. Order, ECF No. 277.

[7] It is undisputed that Defendants maintained a source code control system to manage the historical development of their code. Schnell Decl., ECF No. 263 at 3; Dabral Aff., ECF No. 16-1 ¶¶ 16-17.

deleted from Defendants' system but disagreed as to the extent of the destruction. Myers Decl., ECF No. 259-1 at 6-20; Schnell Decl., ECF No. 263-6 at 4, 5, 8.

After two hearings and reviewing the evidence and briefing on sanctions, this Court determined that sanctions were appropriate, a default judgment should be entered against Defendants Dabral, IPSS, and IRC, and Plaintiffs should be awarded their attorneys' fees and costs for experts. R&R, ECF No. 293. Defendants objected. ECF No. 303. Judge Ellison overruled the objections and adopted the Report and Recommendation in full. Order, ECF No. 304.

After Judge Ellison's ruling, the Court entered a scheduling order for briefing Plaintiff's attorneys' fees and costs. Order, ECF No. 305; Order, ECF No. 309. Shortly thereafter, Dabral notified this Court that he filed for bankruptcy protection. Def.'s Sugg. Bankr., ECF No. 310. Accordingly, the case was automatically stayed. 11 U.S.C. § 362. Once the bankruptcy stay had been lifted, Plaintiffs filed the additional briefing this Court ordered. ECF Nos. 312, 313. The Court then awarded Plaintiffs' partial attorneys' fees and expert costs for the sanctions motion against Dabral, IPSS, and IRC. Order, ECF No. 320. Entry of default was issued against Sah for his failure to defend. Entry Default, ECF No. 302. As a consequence of these orders of default, Defendants are liable to Plaintiffs for each cause of action asserted in the Fourth Amended Complaint.

Plaintiffs now move for entry of final judgment, seeking monetary damages

and a permanent injunction. ECF No. 317. Plaintiffs request the following forms of relief as final judgment: (1) the attorneys' fees and expert costs which the Court previously awarded; (2) a permanent injunction; (3) actual damages; and (4) exemplary damages. ECF No. 317 at 3. The Court will address each request in turn.

## II.     PLAINTIFFS ARE ENTITLED TO FINAL JUDGMENT ON THEIR ATTORNEYS' FEES.

Plaintiffs request that the Court include previously awarded attorneys' fees and expert costs as part of the final judgment. ECF No. 317 at 3. The Court ordered Defendants Dabral, IPSS, and IRC to pay Plaintiffs' attorneys' fees in the amount of $362,002.24 and expert costs in the amount of $374,130.00. R&R, ECF No. 293, adopted, Order, ECF No. 304; Order, ECF No. 320. To date, these Defendants have not paid Plaintiffs' attorneys' fees and do not oppose this request. *See generally* ECF No. 321. Likewise, the Court previously order Sah to pay Plaintiffs' attorneys' fees in the amount of $17,917.20 as a sanction. Order, ECF No. 244. To date, Sah has not paid Plaintiffs.

Therefore, the Court recommends that Plaintiffs' request to include attorneys' fees and expert costs in the final judgment should be granted.

## III.    PLAINTIFFS ARE ENTITLED TO RECOVER ACTUAL DAMAGES.

Plaintiffs seek actual damages for Defendants' misappropriation. ECF

No. 317 at 4. In support, Plaintiffs contend that actual damages should be calculated based on their development costs for the years 2000-2016.[8]

The Court agrees that Defendants should be liable for actual damages. Instead of awarding Plaintiffs the entire amount of their development costs over the past 16 years, however, it is more appropriate to award a narrower time frame tied to the benefit Defendants received.

### A. Defendants Should Be Liable For Actual Damages.

As a general rule, holders of a trade secret are entitled to some measure of actual damages when a party misappropriates the trade secret. *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974) ("[T]he plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown."). The court has broad discretion and can calculate damages based on any benefit to those who misappropriated the trade secret as well as actual harm to the owner of the trade secret. *Id*. at 538; *see also Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 880 (5th Cir. 2013) (demonstrating the broad discretion afforded to trial courts to fashion actual damages in trade secrets cases). The standard for measuring damages is flexible. *University Computing*. 504 F.2d at 535.

---

[8]Although Calsep began developing its software as early as 1982, ECF No. 317 at 5-6, because of to the difficulty in obtaining records, their calculations are based on the development costs starting in 2000. Hr'g Tr. Apr. 20, 2022, ECF No. 335 at 9.

**1. *The proper measure of damages is based on harm to plaintiffs or benefit to defendants.***

In cases where the plaintiff has not suffered any harm because the trade secret has not been destroyed (*i.e.*, through publication), the value of the trade secret to the plaintiff is not the appropriate measure of damage. *Id.* Here, Defendants have not destroyed the trade secret because there is no evidence or allegation that they disclosed it by publication or otherwise. Thus, the value of the trade secret to Calsep is not the appropriate measure of damage. *Id.* Plaintiffs' request to recover the costs of development since 2000, therefore, is not warranted.

A second measure of damages is not what the plaintiff lost, but the benefits, profits, or advantage the defendant obtained in the use of the trade secret. *Id.* at 536. Actual profits can be used as a measure of damages, if provable. *Id.* But, "a lack of actual profits does not insulate the defendants from being obligated to pay for what they wrongfully obtained in their mistaken belief that their theft would benefit them." *Id.*; *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 962 (S.D. Tex. 2013) (citing *In re Cawood Patent*, 94 U.S. 695 (1877)) (holding a defendant can be liable for actual damages despite never having profited from the misappropriated trade secrets.); *accord Union Carbide Corp. v. Graver Tank and Manufacturing Co.*, 282 F.2d 653, 674-75 (7th Cir. 1960), cert. denied, 365 U.S. 812 (1961) (same). In cases like this where defendants have used the trade secret to create a product, courts have considered what it would have cost them to develop the trade

secret on their own. *University Computing*, 504 F.2d at 538. In such cases, most courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendants put the trade secret to after misappropriation, using the plaintiff's development cost as one factor in the calculation. *Id.*

### 2. *Defendants put Plaintiffs' trade secret to commercial use.*

For a plaintiff to recover actual damages, however, the defendant must have put the trade secret to some commercial use. *Id.* at 539. In *University Computing*, the Fifth Circuit identified three ways in which a defendant may put the trade secret to commercial use: (1) offering their product to potential buyers, (2) displaying the trade secret or holding it out to potential competitors, and (3) using the trade secret in defendants' own development process. *Id*. at 542.

The evidence and allegations establish that Defendants put the trade secret to commercial use in at least two ways. First, Defendants offered the product to potential buyers. Defendants used BPSS' website to market their PVT software program. Hr'g Tr., Apr. 20, 2022, ECF No. 335 at 80. Calsep's President testified that, in January 2018, BPSS' website marketed PVT software that described its functionality that appeared to be identical to Calsep's PVT program. *Id.* at 24, 80; Pls.' Fourth Am. Compl., ECF No. 205 at ¶ 37. Defendants admitted that Dabral created IPSS specifically with the intent of marketing the software Defendants

created. Hr'g Tr., Apr. 20, 2022, ECF No. 355 at 96-98. In fact, Defendants successfully entered at least one contract for the development of PVT software. IRC, through Dabral, was created to perform consulting and software development for Apache. *Id.* at 95, 102-03. At some point, Apache determined that it wanted a PVT software program. *Id.* at 102, 107. Dabral was to design it and BPSS was to write the code. *Id.* at 97, 102, 107. Calsep's President testified that Apache was a client of Plaintiffs, using the PVT software under a license agreement. *Id.* at 50-51. Thus, the testimony establishes that Defendants were directly competing with Plaintiffs for Apache's work. In addition, Defendants also tried to market PVT overseas. Sah contacted Plaintiffs' agent in Indonesia to market Defendants' product in competition with Plaintiffs in Indonesia. *Id.* at 51.

The second way Defendants put the trade secret to commercial use was that they used it to create their own product. Pls.' Fourth Am. Compl., ECF No. 205 at 34. The evidence showed that Defendants had access to Plaintiffs' trade secret, and then they designed their user interfaces for their PVT software program to look identical Plaintiffs software except that the page color and fonts were different. Calsep Inc.'s President testified that both interfaces had the same menu, titles, and layout; their intended features, capabilities, and functionality appeared identical. Hr'g Tr., Apr. 20, 2022, ECF No. 355 at 34-37, 42-47 (comparing ECF No. 164-3, Plaintiffs' interface, with ECF No. 164-4, Defendants' interface). He further testified

that, with access to Plaintiffs' source code, Defendants could easily make minor modifications to the interface and offer the same product with the same functionality. *Id.* at 24. Dabral testified that the webpage interface was merely a mockup designed to show Apache the potential design for the program. *Id.* at 104-06. He further testified that Defendants' software program was never completed because Apache pulled the funding. *Id.* at 106.

Despite never profiting from the software, Defendants put Plaintiffs' software to commercial use, justifying the award of actual damages against them. *University Computing*, 504 F.2d at 537.

## B. Defendants Should Pay Three Years Of Development Costs.

The Court has broad discretion to use a variety of metrics in calculating actual damages, *Union Carbide Corp.*, 282 F.2d at 674-75, provided they are not speculative and are tied to the trade secret at issue,[9] *Univ. Computing Co.*, 504 F.2d at 539. Plaintiffs bear the burden of demonstrating that their requested damages from Defendants' misappropriation are tied to the trade secret itself. *See, e.g., Epic Sys.*

---

[9] Defendants assert the proper measure, if any, would be the licensing fees that Calsep charges for use of its software. ECF No. 321 at 5. The Court finds that this measure of damages is not sufficient. *See Union Carbide Corp.*, 282 F.2d at 674-75 (rejecting a calculation of damages based on licensing fees for not accurately representing defendant's gain). As Calsep's President testified, a licensee of its PVTsim software cannot access the source code and would be unable to make a copy of PVTsim or otherwise appropriate the software. Hr'g Tr., Apr. 2022, ECF No. 335 at 24-25. Defendants' access to Calsep's source code was unlimited and enabled them to copy the program to make the same product. To use licensing costs as actual damages effectively rewards Defendants' bad behavior, allowing them to pay only the small fee ($20,000 to $170,000) any Calsep client would pay for legitimate limited access to Plaintiffs' software.

*Corp v. Tata Consult. Serv. Ltd.*, No. 14-cv-748-wmc, 2016 WL 1466579, at *5-6 (W.D. Wisc. Apr. 14, 2016). Plaintiffs seek the entirety of their provable development costs from 2000-2016, without tying it to the Defendants' misappropriation or the benefit they obtained. ECF No. 321 at 4-5.[10] Considering the Plaintiffs' development cost as one factor in the calculation, the Court adjusted the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the Defendants put the trade secret to after misappropriation. *University Computing*, 504 F.2d at 538.

Calsep's President testified that use of Plaintiffs' trade secret would give Defendants a competitive advantage. Because they could easily duplicate the software without the associated costs to develop it, Defendants could sell their PVT software at a lower price, driving Calsep out of the market. Hr'g Tr., Apr. 20, 2022, ECF No. 355 at 50. He further testified that it took Calsep more than 30 years to create and hone its product, which Defendants could not duplicate so quickly without access to Plaintiffs' source code. *Id.*

The evidence establishes that Sah worked for Defendants for approximately

---

[10] Defendants argue that "Calsep does not segregate the costs associated with developing the confidential and proprietary components of PVTsim from those associated with the unprotected components of the code. Further, Calsep provides no evidence or argument to support the position that its full development cost is representative of the costs saved by Defendants." ECF No. 321 at 4-5.

13 years. During the last couple of years, as a trusted employee, he was on a committee that gave him access to the trade secret source code. Sah stole the source code and other confidential files from Plaintiffs in March 2017 just before his last day of work there. Between 2017 and 2020, Defendants attempted without financial success to duplicate Plaintiffs' PVT program. They marketed it and contracted with one of Plaintiffs' customers to develop a similar or identical PVT program. Although having Plaintiffs' source code should have provided them with a competitive advantage to duplicate Plaintiffs' software, according to Dabral, the program was never fully developed, primarily because of a lack of funding, and Defendants earned no profits from their endeavor. Based on this record, the Court finds that the most recent three recorded years of Plaintiffs' development costs would sufficiently compensate the Plaintiffs for the benefit Defendants obtained. Based on the data Plaintiffs provided to the Court, their actual damages are $4,268,753.00.[11] This award sufficiently addresses both the harm to Plaintiffs and the benefit Defendants gained in misappropriating Plaintiffs' software.

Thus, the Court recommends that Plaintiffs should be awarded actual damages, consisting of their development costs for the three years of 2014 - 2016 in the amount of $4,268,753.00.

---

[11] Plaintiffs' evidence shows the following amounts for their damages: $1,452,136 in 2014, $1,526,511 in 2015, and $1,290,106 in 2016

## IV.   EXEMPLARY DAMAGES

Plaintiffs request the Court to award exemplary damages pursuant to the Texas Uniform Trade Secrets Act. However, they have failed to sufficiently justify an award of exemplary damages.

Texas state law allows for exemplary damages in cases where Defendants misappropriate trade secrets. Tex. Civ. Prac. & Rem. Code § 134A.004(b). To establish entitlement to exemplary damages, the plaintiff must demonstrate clear and convincing evidence of (1) fraud, (2) malice, or (3) gross negligence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West). For example, if a plaintiff claims actual damages through lost profits, then it must prove by clear and convincing evidence that the lost profits it suffered resulted from malice. In other words, the plaintiff would have to prove that the defendant specifically intended to cause a substantial injury. *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 283 (Tex. App. 2018); *see also Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 871–81 (Tex. 2017) (finding that exemplary damages were excessive in a case involving misappropriation of trade secrets). The intent to commit the tort alone, however, cannot justify an award of exemplary damages. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 454 (Tex. 1996) (internal citations omitted) (wrongdoing associated with intentional tort did not satisfy heightened standard for exemplary damages on its own). Rather, the substantial injury which the plaintiff is

required to establish must be independent from the tort, or here, the misappropriation of trade secrets. *Eagle Oil & Gas Co.*, 549 S.W.3d at 283.

Plaintiffs asserted in court that Defendants' behavior demonstrates malice sufficient to justify exemplary damages. Hr'g Tr., Apr. 20, 2022, ECF No. 335 at 130-31. Defendant Sah removed Plaintiffs' software with the intent to copy it and market it as his own in connection with other Defendants. *Id*. According to Plaintiffs, Defendants' actions were both willful and malicious. *Id*. at 130.

Plaintiffs failed to carry their heavy burden to justify awarding exemplary damages. *See Cont'l Coffee*, 937 S.W.2d at 454. Plaintiffs failed to identify a substantial injury separate from the misappropriation of their trade secrets. *See* ECF No. 317 at 6 (wherein Plaintiffs identify Tex. Civ. Prac. & Rem. Code § 134A.004(b) and request exemplary damages without identifying what behavior Plaintiffs claim to be malicious or how that behavior is separate from the intentional tort).[12] Plaintiffs have not provided a sufficient record to justify an award of exemplary damages.

Therefore, the Court recommends that Plaintiffs' motion for exemplary damages should be denied.

## V.   PERMANENT INJUNCTION

Plaintiffs request a permanent injunction against Defendants' continued

---

[12] While Plaintiffs argued in court that Defendants' behavior was willful and malicious, this still does not fully articulate the proper standard nor offer sufficient evidence. ECF No. 335 at 130; *see Eagle Oil & Gas Co.*, 549 S.W.3d at 283.

possession and use of Plaintiffs' confidential information and trade secrets. ECF No. 17 at 6-7. Plaintiffs argue that an injunction is necessary to prevent further harm, as Defendants still possess Plaintiffs' trade secrets and have yet to return hard drives containing Plaintiffs' confidential information. *Id*. The parties previously agreed to a preliminary injunction, and Defendants do not challenge entry of a permanent injunction in general. Agreed Prelim. Injunction, ECF No. 198; ECF No. 321 at 8-10. A permanent injunction would prohibit Defendants' future use of trade secret information.

The Fifth Circuit favors permanent injunctions for most misappropriation of trade secrets cases. *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986). The decision to grant injunctive relief is in the discretion of the trial court. *Crain v. Unauthorized Prac. of L. Comm. of Supreme Ct. of Texas*, 11 S.W.3d 328, 332 (Tex. App.—Houston [1st Dist.] 1999, pet. denied), *cert. denied*, 532 U.S. 1067 (2001). If the facts of a case conclusively show that a party continues to violate substantive law, however, the Court should enjoin the violation without discretion. *Id*. Actual or threatened disclosure or use of trade secrets may also be enjoined. *Keurig Dr Pepper Inc. v. Chenier*, No. 4:19-CV-505, 2019 WL 3958154, at *7 (E.D. Tex. Aug. 22, 2019) (internal citations omitted) ("[I]t is proper for courts to enter an injunction upon a showing that a defendant probably, rather than, in fact, disclosed trade secrets.").

To obtain injunctive relief, Plaintiffs must demonstrate four elements, all of which are necessary: (1) a wrongful act, (2) imminent harm, (3) irreparable injury, and (4) no adequate remedy at law. *Oracle Elevator Holdco, Inc. v. Exodus Sols., LLC*, No. 4:19-CV-4658, 2021 WL 4077581, at *23 (S.D. Tex. Sept. 8, 2021) (Ellison, J.) (internal citations omitted). In *Oracle Elevator*, the Court explained that the apprehension or fear of future harm is not sufficient. *Id*. Rather, the Plaintiff must demonstrate actual harm.

Because the Court previously awarded sanctions that included a default judgment against Defendants Dabral, IPSS, and IRC, and Sah has defaulted, the allegations in Plaintiffs' complaint are taken as true. *Commodity Futures Trading Comm'n*, 2021 WL 4059385, at *5. Defendants' motion to reconsider has been denied. R&R, ECF No. 337. Thus, Plaintiffs have established that Defendants wrongfully misappropriated and used Calsep's software to develop a competing product. ECF No. 205 at 14. Defendants' misappropriation and use of Calsep's trade secret software sufficiently demonstrate wrongful acts to satisfy the standard for injunctive relief. *Oracle Elevator*, 2021 WL at *23.

Second, Plaintiffs have sufficiently demonstrated that a risk of imminent harm exists. Defendants possess copies of Plaintiffs' software and have repeatedly defied Court orders to turn over the software and other evidence. Order, ECF No. 161; R&R, ECF No. 293. As Defendants possess misappropriated trade secrets, they

could still develop a competing product in the future using Plaintiffs' software. Hr'g Tr., April 20, 2022, ECF No. 335 at 50. Plaintiffs' feared harm is neither speculative nor imagined, as Defendants already attempted to develop a competing product and marketed it to potential customers, including customers of Calsep. ECF No. 335 at 97, 102. Therefore, Plaintiffs are at risk of imminent harm which warrants injunctive relief. *Oracle Elevator*, 2021 WL at *23.

Third, this harm would result in irreparable injury. As alleged in their complaint, which is taken as true, Plaintiffs invested decades of effort and significant financial resources to develop their software. Pls.' Fourth Am. Compl., ECF No. 205 at 2. Defendants attempted to bypass this process and produce a competing product at a lower price, essentially undercutting Plaintiffs and driving them out of the market. *Id*. at 15; Hr'g Tr., Apr. 20, 2022, ECF No. 335 at 50. If this occurred, Plaintiffs would suffer irreparable harm. *Oracle Elevator*, 2021 WL at *23.

Finally, although Plaintiffs should recover their actual damages based on their harm and Defendants' benefit in the past, Plaintiffs have no adequate remedy at law that would address Defendants' continued possession of the trade secret software. Defendants' possession of Plaintiffs' trade secret would allow them to create a competing product that could be marketed in the future. In fact, both Plaintiffs and Defendants recognize that some form of injunctive relief is appropriate in this case. *Compare* Pls.' Mot., ECF No. 317 at 6-7 ("Calsep continues to face imminent harm

if Defendants are not permanently enjoined from further possession and use of Calsep's confidential information and trade secrets") *with* Defs' Resp., ECF No. 321 at 10 ("a permanent injunction prohibiting Defendants' completion or use of InPVT is fully capable of curing any alleged harm to Calsep"). Plaintiffs have satisfied the standard for injunctive relief. *Oracle Elevator*, 2021 WL at *23.

The Court therefore recommends that Defendants be permanently restrained, enjoined, and prohibited from:

(1)     directly or indirectly copying, accessing, disclosing, or using any of Calsep A/S's trade secret and confidential information, including the PVTsim software itself, the PVTsim source code, client tutorials related to PVTsim, and the PVTsim course material. Defendants shall also not use any of Calsep A/S's trade secret and confidential information to solicit or convert any of Calsep A/S's or Calsep Inc.'s customers or encourage their customers to reduce the amount of business they do with Calsep A/S or Calsep Inc;

(2)     using any information Defendants created that arises from Calsep A/S's trade secret or confidential information or copyrighted works;

(3)     developing or using software, including but not limited to InPVT, URCAT, and InPDA, that is based on and/or derived from Calsep A/S's trade secret or confidential information or copyrighted works;

(4)     developing any software product that requires hydrocarbon components (pure or pseudo components), nitrogen, hydrogen, carbon dioxide, or water and their relative proportion (weight percentage or mole percentage) as a simulation input. Further, Defendants shall not create or develop any product which performs compositional phase equilibrium calculations on petroleum reservoir fluids (*i.e.* flash calculations). However, Defendants are allowed to create/develop products in which hydrocarbon components (pure or pseudo components), nitrogen, hydrogen, carbon dioxide, or water and their relative proportion (weight percentage or mole percentage) are not an input so long as Defendants do not use any of Calsep A/S's trade secret and confidential information, including the PVTsim software itself, the PVTsim source code, client tutorials related to PVTsim, and the PVTsim course material, in doing so; and

(5)     developing or using software receiving PVT simulation inputs from InPVT, InPDA, PVTsim, and/or any simulation software derived from Calsep A/S's trade secret or confidential information or copyrighted works.

Further, the Court recommends that Defendants be ordered: to return to Calsep A/S all Calsep A/S's trade secret and confidential information and copyrighted works within their possession, custody, or control as permitted by 18 U.S.C. § 1836(b)(3)(A), Tex. Civ. Prac. & Rem. Code § 134A.003, and other applicable law within 3 days of the date the Court signed this Order. Until Pashupati Sah provides Calsep A/S with the three External Storage Devices to which Defendant Pashupati Sah downloaded Calsep A/S's trade secret information, and any copies of those External Storage Devices, Pashupati Sah is ordered to not engage

in any work, consulting, teaching or employment that involves the development, sale, or use of PVT simulation software.[13]

The Court recommends that these injunctive relief provisions be binding upon Pashupati Sah, Ashish Dabral, IRC and IPSS, upon any person under the authority or control of Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with a Defendant.

## VI.    CONCLUSION

The Court recommends that Plaintiffs' motion for entry of final judgment, ECF No. 317, be **GRANTED IN PART**, consistent with the Final Judgment attached hereto as Exhibit A.

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). Failure to file timely objections will preclude review of factual findings or legal conclusions, except for plain error. *Quinn v. Guerrero*, 863 F.3d 353, 358 (5th Cir. 2017).**

---

[13] The Court previously allowed Defendants' expert to retain copies of Defendants' forensic images for custodial purposes. ECF No. 331. Upon the conclusion of this litigation and exhaustion of any appeals, Defendants' expert is ordered to destroy any copies of the forensic images still in their possession, provide certification of that destruction to the Court, and refuse to provide any copies of such images to anyone including Defendants.

Signed at Houston, Texas, on June 10, 2022.

_____

**Dena Hanovice Palermo**
**United States Magistrate Judge**

**EXHIBIT A**
**FINAL JUDGMENT**

UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CALSEP A/S, | § | |
| CALSEP, INC., | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | |
| | § | No. 4:19-cv-1118 |
| INTELLIGENT PETROLEUM | § | |
| SOFTWARE SOLUTIONS, LLC, | § | |
| ASHISH DABRAL, | § | |
| INSIGHTS RESERVOIR | § | |
| CONSULTING, LLC, and | § | |
| PASHUPATI SAH, | § | |
| | § | |
| *Defendants.* | § | |

## FINAL JUDGMENT

In accordance with the R&R entered June 10, 2022, it is hereby **ORDERED** that Plaintiff's Motion for Entry of Final Judgment, ECF No. 317, is **GRANTED** as follows:

1. Defendant Pashupati Sah ("Sah") shall pay Plaintiff attorneys' fees in the amount of $17,917.20 previously awarded as a sanction.

2. Defendants Ashish Dabral ("Dabral"), Intelligent Petroleum Software Solutions, LLC ("IPSS"), and Insights Reservoir Consulting, LLC ("IRC") shall pay Plaintiffs $362,002.24 to reimburse for their

24

attorneys' fees and $374,130.00 to reimburse for their expert costs previously awarded as a sanction.

3. Defendants shall pay Plaintiffs actual damages in the amount of $4,268,753.00.

In addition, all Defendants are subject to the following Permanent Injunction:

Defendants shall be permanently **RESTRAINED**, **ENJOINED**, and **PROHIBITED** from:

(1)   directly or indirectly copying, accessing, disclosing, or using any of Calsep A/S's trade secret and confidential information, including the PVTsim software itself, the PVTsim source code, client tutorials related to PVTsim, and the PVTsim course material. Defendants shall also not use any of Calsep A/S's trade secret and confidential information to solicit or convert any of Calsep A/S's or Calsep Inc.'s customers or encourage their customers to reduce the amount of business they do with Calsep A/S or Calsep Inc.;

(2)   using any information Defendants created that arises from Calsep A/S's trade secret or confidential information or copyrighted works;

(3)   developing or using software, including but not limited to InPVT, URCAT, and InPDA, that is based on and/or derived from Calsep A/S's trade secret or confidential information or copyrighted works;

(4)   developing any software product that requires hydrocarbon components (pure or pseudo components), nitrogen, hydrogen, carbon dioxide, or water and their relative proportion (weight percentage or mole percentage) as a simulation input. Further, Defendants shall not create or develop any product which performs compositional phase equilibrium calculations on petroleum reservoir fluids (*i.e.* flash calculations). However, Defendants are allowed to create/develop products in which hydrocarbon components (pure or pseudo components), nitrogen, hydrogen, carbon dioxide, or water and their relative proportion (weight percentage or mole percentage) are not an input so long as Defendants do not use any of Calsep A/S's trade secret

and confidential information, including the PVTsim software itself, the PVTsim source code, client tutorials related to PVTsim, and the PVTsim course material, in doing so; and

(5)     developing or using software receiving PVT simulation inputs from InPVT, InPDA, PVTsim, and/or any simulation software derived from Calsep A/S's trade secret or confidential information or copyrighted works.

Further, all Defendants are **ORDERED** to return to Calsep A/S all of Calsep A/S's trade secret and confidential information and copyrighted works within their possession, custody, or control as permitted by 18 U.S.C. § 1836(b)(3)(A), TEX. CIV. PRAC. & REM. CODE § 134A.003, and other applicable law within 3 days of the date the Court signed this Order. Until Pashupati Sah provides Calsep A/S with the three External Storage Devices to which Defendant Pashupati Sah downloaded Calsep A/S's trade secret information, and any copies of those External Storage Devices, Pashupati Sah is ordered to not engage in any work, consulting, teaching or employment that involves the development, sale, or use of PVT simulation software.

The Court previously allowed Defendants' expert to retain copies of Defendants' forensic images for custodial purposes. ECF No. 331. Upon the conclusion of this litigation and exhaustion of any appeals, Defendants' expert Ron Schnell is **ORDERED** to destroy any copies of the forensic images still in his possession, custody, or control; provide certification of that destruction to the Court; and refuse to provide any copies of such images to anyone including Defendants.

These injunctive relief provisions are binding upon Sah, Dabral, IRC and IPSS, upon any person under the authority or control of Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with a Defendant.

This is a final, appealable judgment.

**It is so ORDERED.**

Signed at Houston, Texas, on               , 2022.


_____
                          Keith Ellison
                          United States District Judge